Estate of Halley Tarr, Deceased, Murray Tarr, Nancy Tarr and Isidore B. Rosman, Executors v. Commissioner. Isidore B. Rosman, et al., Trustees under the Will of Halley Tarr, Deceased, Transferees of the Assets of the Estate of Halley Tarr, Deceased v. Commissioner.
Estate of Tarr v. Commissioner
Docket Nos. 29614, 30796.
United States Tax Court
1952 Tax Ct. Memo LEXIS 21; 11 T.C.M. (CCH) 1151; T.C.M. (RIA) 52340; November 28, 1952
*21 Jacquin D. Bierman, Esq., for the petitioners. Clay C. Holmes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioners appeal from the following determination of deficiencies in income taxes and assertion of 50 per cent fraud penalties for the calendar years 1942, 1943, 1944 and 1945: Deficiency
Year
Income Tax
Penalty
1942
$ 3,142.29
$ 1,571.15
1943
17,974.74
8,911.05
1944
44,992.61
22,496.31
January 1, 1945 to
April 14, 1945
708.00
354.00
Total
$66,817.64
$33,332.51 It has been stipulated that Isidore B. Rosman, et al., Docket No. 30796, are liable as transferees for any tax and penalty found to be due from the Estate of Halley Tarr, Deceased, hereinafter sometimes referred to as petitioner, Docket No. 29614. Part of the deficiencies have been agreed to. The remaining issues are (1) whether respondent correctly increased Halley Tarr's income; (2) whether petitioners are liable for 50 per cent fraud penalties; and (3) whether the earnings and profits of H. Tarr, Inc. were sufficient to constitute certain distributions amounting to $43,791.13 dividends. Some of the facts were *22 stipulated. Findings of Fact The stipulated facts are hereby found accordingly. The returns of Halley Tarr for the years in question were filed with the collector of internal revenue for the third district of New York. Halley Tarr, hereinafter sometimes referred to as decedent, was in the photographic business from 1898 until his death on April 14, 1945. During the years involved herein he was the sole stockholder of H. Tarr, Inc., which was incorporated in 1932 and engaged in the business of operating photography studios. Prior to 1932 decedent conducted his business operations as an individual. In his statutory notices respondent computed decedent's unreported income for the years 1942, 1943, 1944 and 1945 as follows: 1942
1943
1944
1945
Unexplained cash on hand (i.e. $39,200 cash gift)
$9,800
$13,066.67
$13,066.67
$3,266.67
Unexplained bank deposits
19,885.81
U.S. Gov't bonds (source of funds unknown)
10,000.00
U.S. Gov't bonds (purchased by H. Tarr, Inc.)
20,000.00
20,000.00
Mortgage payment (H. Tarr, Inc.'s check to Inter-
county Title Co.)
3,791.13
$9,800
$33,066.67
$66,743.61
$3,266.67
During the year *23 1945 decedent distributed $39,200 in cash to his seven children. This amount was contained in a box and decedent asked his children to distribute it among themselves, which they did. Each child received $5,600. Respondent determined the total amount to be taxable income to decedent in the amounts of $9,800 for the calendar year 1942, $13,066.67 for each of the calendar years 1943 and 1944, and $3,266.66 for the calendar year 1945. These allocations were made on the basis of the fiscal years of H. Tarr, Inc. because the photographic business started to earn money according to the corporate returns in the fiscal year ended March 1943, and respondent concluded that the funds were earned by the corporation in those three years and accumulated by decedent at his home. The unexplained bank deposits were computed by taking the excess of deposits in decedent's bank account during 1944 over the amount of adjusted gross income reported on decedent's personal income tax return. The report of the Revenue Agent erroneously determined this excess to be $19,885.81. The correct amount, which consisted of intermittent deposits, is $17,185.81. The examination of decedent's finances did not go back *24 beyond the calendar year 1942. Respondent did not obtain or compile a net worth statement for decedent as of January 1, 1942. Respondent obtained only transcripts of decedent's personal bank accounts beginning with April 1943. Decedent's personal bank account at the Chemical Bank and Trust Company of New York was opened on November 2, 1942; the bank account in the National City Bank of Long Beach was opened May 3, 1944. Decedent loaned monies to Edward Tarr. Respondent allocated all of the excess bank deposits to decedent's income for the year 1944. United States Government bonds to the value of $10,000 purchased in November 1944 with funds the source of which is not known, were a part of decedent's estate and were reported in the estate tax return. Of this amount, $5,000 worth represents purchases by Nancy Tarr. Respondent determined that these bonds represented taxable income to decedent for the calendar year 1944. Additional U.S. Government bonds were purchased by corporate checks of H. Tarr, Inc. in the amounts and on the dates indicated below: September 8, 1943
$20,000
March 29, 1944
10,000
June 20, 1944
10,000
Total
$40,000 Each of these bonds was *25 delivered to Halley Tarr subsequent to the date of the corporation's purchase and was reported as part of decedent's estate. On January 7, 1944, H. Tarr, Inc. made a payment in the amount of $3,791.13 in discharge of the mortgage on decedent's personal residence. The income tax returns of decedent were, for the most part, connected with the affairs of the corporation. Decedent had no other apparent source of income than from the corporation. The weekly records of the sales of the various studios of H. Tarr, Inc. were kept by the employees of each studio. The receipts less the studio expenses of each studio were deposited by the separate studio employees in the local branches of the depository banks in which the corporation kept its accounts. For its fiscal years ended March 31, 1944 and March 31, 1945, the total deposits by H. Tarr, Inc. in its bank accounts, when added to the total expenditures by the various studios out of cash receipts, approximately equal the total sales shown by the various studios on their weekly store sales reports. During its fiscal year ended March 31, 1943, H. Tarr, Inc. made deposits in the amount of $16,436.05 which were in excess of the amounts specifically *26 identified as store sales. The only books maintained by H. Tarr, Inc. were cash receipts and disbursements books and a general ledger. The cash receipts and sales book are one and the same. Each week, each of the studios submitted a sales sheet which recorded the weekly sales, the expenses of the studio, and the amount which the studio had deposited during the week. These were cash reports. These reports were entered in the cash receipts book which had three columns corresponding with the columns on the studio sales sheet. The total of the sales column in the cash receipts book was posted to the sales account; the total of the deposits column was posted to the cash account; the store expense column was analyzed and posted to the amounts to which it pertained. The cash receipts and sales book show that various funds had been received from various studios throughout the city. These funds were then posted to the sales account in the general ledger. The totals of the cash receipts book of H. Tarr, Inc. did not agree with amounts transferred to the general ledger. The bank deposits of H. Tarr, Inc., which agreed with the studio reports, were used by respondent's representatives to *27 determine the true income, and allowance was made for studio expenses. Most other accounts of H. Tarr, Inc., other than the sales and sales tax accounts, were in agreement with the books and records and the tax returns, and were accepted by respondent except for ordinary tax adjustments. If the total amounts of sales and income of H. Tarr, Inc. are increased by the amounts set forth in its deficiency notice, the ratio of net income to sales would be 23.36 per cent for the fiscal year ended March 31, 1943; 24.6 per cent for the fiscal year ended March 31, 1944; and 27.50 per cent for the fiscal year ended March 31, 1945. The ratio of net income to total compiled receipts of all photographic studios reporting income was 7.77 per cent for the year 1942; 11.11 per cent for the year 1943; 11.51 per cent for the year 1944; and 8.83 per cent for the year 1945. The Federal income tax returns of H. Tarr, Inc. for the fiscal years 1935, 1936, 1937, 1939 and 1941 through 1945 show the following income or loss: Fiscal
Year Ended
Loss
Income
3/31/35
$1,258.49
3/31/36
752.16
3/31/37
750.24
3/31/39
747.29
3/31/41
2,692.26
3/31/42
72.32
3/31/43
$ 6,537.76
3/31/44
20,010.24
3/31/45
38,748.13
*28 On May 1, 1950, respondent, in a statutory notice of deficiency to H. Tarr, Inc., determined that the corporation had unreported income for the fiscal years ended March 31, 1943, March 31, 1944 and March 31, 1945 in the amounts of $34,867.48, $46,588.75 and $47,688.84, respectively. The books of H. Tarr, Inc. showed a surplus or deficit for the fiscal years 1942 through 1945 as follows: Fiscal year
Surplus
ended March 31
(Deficit)
1942
($2,548.34)
1943
6,006.99
1944
11,338.38
1945
19,697.95 If the unreported income and the Federal income and excess profits taxes and penalties determined by respondent on May 1, 1950 are taken into account, H. Tarr, Inc. would have the following deficits for each of those years: Fiscal year
ended March 31
(Deficit)
1942
($2,548.34)
1943
(12,240.34)
1944
(13,698.68)
1945
( 6,448.36)
The Federal income tax returns of H. Tarr, Inc. for fiscal years 1935 through 1945 stated that the method used in computing net income was, respectively, as follows: Fiscal year
Accounting
ended March 31
Method
1935
no answer
1936
accrual
1937
no answer
1938
return missing
1939
accrual
1940
return missing
1941
accrual
1942
accrual
1943
cash
1944
not on cash basis
1945
cash
*29 H. Tarr, Inc. made no request for nor was it granted permission to change from one basis of accounting to another. The gross sales reported by H. Tarr, Inc. on its Federal income tax returns for the fiscal years 1942-1945, inclusive, were $99,031.63, $161,331.45, $254,539.04 and $273,891.06, respectively. In the Federal income tax return filed by H. Tarr, Inc. for the fiscal year ended March 31, 1942 the gross receipts are entered on line 4, page 1 on the return which states, "Gross receipts (where inventories are not an income-determining factor.)" The corporation did not report receivables on its books at any time. The only item of inventory was photographic supplies. The balance sheets attached to the corporation's Federal income tax returns from 1935 through 1945 show small amounts of accounts receivables for the fiscal years ended March 31, 1936, 1937, 1942, and 1943. With some exceptions, the accounts were as they were stated in the tax returns. The Federal income tax return of H. Tarr, Inc. for the fiscal year ended March 31, 1943 shows on its balance sheet: accounts receivable, inventory, deferred expense, accounts payable, and accrued expenses and taxes. The Federal *30 income tax return of H. Tarr, Inc. for the fiscal year ended March 31, 1944 shows: inventories, accounts payable, accrued payroll, accrued Federal income and excess profits taxes. The Federal income tax return for the fiscal year ended March 31, 1945 shows: inventories, accounts payable, accrued expenses and accrued Federal income and excess profits taxes. The balance sheets of the corporation show accounts payable, loans payable, and accrued items payable for every fiscal year from 1936 through 1942. Prepaid items are also listed in three of those years. Respondent did not disallow and did not question the use of inventories and accrual items in computing the corporation's net income. In 1950, respondent determined an overpayment of petitioner's estate taxes on the ground that the stock of H. Tarr, Inc., which had been valued at $53,062.18 in determining the original corrected liability, was worthless because of the assessment of Federal income and excess profits tax deficiencies and penalties against the corporation. During the fiscal year ended March 31, 1942, decedent's investment in the capital stock of H. Tarr, Inc. was increased from $3,400 to $10,000. During the year *31 ended March 31, 1943, the capital stock of H. Tarr, Inc. was increased from $10,000 to $25,000 on its books and records. The Federal income tax returns filed by the decedent for the years 1942 through 1945 show the following income: 1942
$6,240.00
1943
6,750.00
1944
7,950.00
1945
1,625.00
The personal bank deposits of decedent exceeded his reported income for the respective years. Decedent's personal expenditures were fully equal to the salary he withdrew from the corporation. Decedent was in receipt of ordinary income which he did not report of $9,800 in 1942, $33,066.67 in 1943, $64,043.61 in 1944, and $3,266.67 in 1945. Decedent did not personally prepare his income tax return for 1945. The 1945 Federal income tax return for decedent was filed on Form W-2 by decedent's executors. The fraud penalty was imposed upon decedent for the year 1945 because respondent concluded that any person preparing a return for decedent would have been misled and would have filed a fulty return. No part of the deficiencies in income tax determined against decedent for any year involved was due to fraud with intent to evade tax. Opinion Our findings of fact effectively *32 dispose of the first two issues. We have found that the income in question was received by decedent because petitioner has completely failed to carry its burden of proof to the contrary. Any suggestion that respondent's determination was so arbitrary as to necessitate ignoring it, cf. , is belied by the circumstances of the unexplained bank deposits, , certiorari denied , and in fact by express or tacit admissions with respect to other items. [1] And the corporation's books cannot be viewed as correctly reflecting either corporate income or decedent's withdrawals. Otherwise it is impossible to explain such apparently unrecorded items as the admitted receipt by decedent from the corporation of Government bonds and the payment of the mortgage on his personal residence. For similar reasons any evidence that the corporation's percentage of profit would have to be higher than the average of the industry is equally unconvincing. On the fraud issue, however, the evidence is likewise inadequate to sustain respondent's burden. *33 . He lacks even the weight of a net worth statement to support his assertion. And for that reason our finding as to petitioner's income was based not on affirmative evidence but purely on failure of proof. Only the payment of some $3,700 for petitioner's account on the mortgage on his home leans toward a presumption of unreported income. But even so, "Isolated instances of discrepancy or occasional lapses from the rigid accountability contemplated by the law might conceivably be overlooked, * * *". . The other items such as his gift to his children, the possession of the bonds and the unexplained bank deposits are as consistent with an innocent explanation as with the charge of fraud. Under these circumstances the burden has not been met. , affd. other issues (C.A. 8) . *34 Although not without some hesitancy, we have concluded the mortgage payment is not by itself sufficient to sustain the fraud penalty. Its comparatively small size, the lack of detail of explanation as to its payment, and whether decedent in fact must be charged with knowledge of it, and particularly the failure to prove any other element justifying an inference of fraud such as illegal operations or the consistent concealment of large sums, lead us to the conclusion that on the fraud item generally the deficiency must be disapproved. . The third issue proceeds from petitioner's contention that assuming decedent's income was derived from the corporation, as respondent asserts, there were not adequate earnings and profits to constitute these distributions dividends, and that accordingly petitioner is taxable only at capital gain rates, at least to some extent. Petitioner relies upon , and , for the proposition that a corporation on the accrual basis is entitled to deduct current taxes in arriving at its accumulated earnings and profits. But the *35 present situation is far different from that which existed there. In those cases the correct amount of the corporate tax liability was directly determined in the proceeding itself. Here there is, on the one hand, no adequate proof of the total earnings and profits of the corporation, nor on the other, are we able to determine in this proceeding that the taxes, and particularly the penalties in question, were in fact owing by the corporation. [2] Petitioner's only reliance is a field audit report communicated to petitioner and dealing with the value of the corporate stock for estate tax purposes. [3] That report, it is true, states that there are deficiencies in taxes and penalties chargeable against the corporation, and that "The time for the filing of a petition before the Tax Court has elapsed; therefore this deficiency is final * * *." But there is no admission on the part of the corporation that the taxes and penalties were owing and, of course, the deficiency has become final only in the sense that the Tax Court lacks jurisdiction to redetermine. *36 That the corporation or someone on its behalf could have paid the taxes and sued for refund is elementary. See e.g. . And while the same field audit report states that the sums in question were "not paid by the corporation because it has not the funds," it adds that "the Collector filed a claim covering this sum against the estate as a transferee." There is no evidence as to any transferee proceeding but it is equally clear that petitioner, as transferee, could raise in any such proceeding the tax liability of the original taxpayer, and insist that no such liability existed. . We accordingly conclude without the necessity of disposing of the litigated question of whether the corporation was in fact on the accrual basis, that petitioner has failed to sustain its burden of showing facts from which we could conclude that the corporate income was so low or the taxes and penalties so high as to eliminate sufficient earnings and profits to make these sums taxable to petitioner as ordinary income. [4] On this issue we find no error in the determination.
*37 In sum, we find in favor of respondent as to the presently asserted deficiencies in income tax for failure on the part of petitioner to bear the burden of proof; and in favor of petitioner with respect to the fraud penalties for a converse reason. Decisions will be entered under Rule 50. Footnotes
1. Petitioner's citation of criminal cases to support his thesis is clearly unwarranted and in at least two instances affirmatively deceptive as where he refers to Kirsch v. United States as "Grover M. Kirsch" ( C.A. 8, ) and to Bryan v. United States as "J. Baker Bryan, Sr." ( C.A. 5, ).↩
2. Petitioner, in fact, apparently argues that the taxes were not due by the corporation. It says in its reply brief: "The action of respondent in taxing such income to Halley Tarr, Inc. and then as dividends to Halley Tarr was arbitrary and capricious and must fail * * *." (Italics added) ↩
3. Other similar material in the record such as the stipulation that a deficiency was determined against the corporation, and an exhibit consisting of a copy of the deficiency notice, indicate no more than that a deficiency was determined. They fall short, as does the field audit, of carrying the burden of showing that the taxes were not only determined but were due.↩
4. Were we to determine here that the corporation owed the taxes and penalties, and that the estate (petitioner) was liable as transferee, it could well be that in any subsequent proceedings brought to collect the full amount of the taxes and penalties involved, such a conclusion in this proceeding might be res judicata against petitioner, disabling it from contesting the otherwise open question of the corporation's tax liability. See United States v. C. C. Clark, Inc. (C.A. 5), , certiorari denied May 5, 1947.↩